IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

ERIC MEURY, *et al.*,                    )
      Plaintiffs,                       )
                      )
      v.                                )          Civil No.  3:16cv872 (MHL)
                      )
OLVERSON'S LODGE CREEK            )
MARINA, INC., *et al.*,                  )
      Defendants.                      )
                      )

## REPORT AND RECOMMENDATION

Plaintiffs Eric Meury ("Meury") and Viktoria Nyari ("Nyari") (collectively, "Plaintiffs") bring this negligence action against Defendants Olverson's Lodge Creek Marina, Inc. (the "Marina") and its owner Frederick Olverson ("Olverson") (collectively, "Defendants"), alleging that Defendants breached common law duties that they owed to Plaintiffs, self-described sailboat enthusiasts, when Plaintiffs rented a boat slip from the Marina in October 2014.  While using a vehicle furnished by Defendants and owned by Olverson to pull a dinghy from the water, Plaintiffs contend that the vehicle suddenly rolled backwards, pinning Meury against a pylon and injuring Nyari as well.  Plaintiffs seek monetary damages for the injuries that they allegedly suffered as a result of Defendants' negligence.

This matter comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on Defendants' Rule 12(b)(6) Motions to Dismiss.  (ECF Nos. 4 and 9.) For the reasons set forth below, the Court recommends that Defendants' Motions to Dismiss be DENIED.

# I.    BACKGROUND

When resolving a motion for judgment on the pleadings, the Court construes the allegations in favor of the non-moving party. Fed. R. Civ. P. 12(c); *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*, 386 F.3d 581, 591 (4th Cir. 2004). Accordingly, for the purpose of resolving Defendants' Motions, the Court finds the relevant facts as follows.

In late October 2014, Plaintiffs rented a boat slip from the Marina, which is owned by Olverson and located on the Yeocomico River. (Compl. (ECF. No. 1) ¶¶ 8, 14, 24.) As a service to its patrons, the Marina provided courtesy tow vehicles for their use, including a 1999 Jeep Grand Cherokee (VIN 1J4GW58S6XC717733) (the "Jeep") to place boats in or remove them from the water. (Compl. ¶¶ 11-12.) Olverson owned the Jeep and had it registered to the Marina's address since January 2003. (Compl. ¶ 15.)

On October 30, 2014, Meury used the Jeep to pull a dinghy from the water. (Compl. ¶¶ 26-27.) After attaching a trailer to the tow hitch, Meury backed the Jeep down the Marina's boat ramp. (Compl. ¶ 28.) He then placed the Jeep in Park and got out to help Nyari secure the dinghy. (Compl. ¶ 29.) With both Plaintiffs behind it, the Jeep suddenly rolled backwards, pinning Meury against a pylon and injuring Nyari as well. (Compl. ¶ 30.) Meury suffered injuries to his lower left extremity that required emergency evacuation from the Marina, and Nyari also injured her lower left extremity and sustained contusions. (Compl. ¶¶ 32-33.)

As alleged, when the Jeep unexpectedly rolled down the boat ramp and injured Plaintiffs, it resulted from an unintended powered roll-away ("UPR"). (Compl. ¶¶ 18, 30-31.) According to a final report (the "Report") issued in February 2003 by the U.S. Department of Transportation's National Highway Traffic Safety Administration ("NHTSA"), a UPR occurs

when drivers "allegedly stop the vehicle, place the transmission in Park, leave the engine running, and exit the vehicle." (Compl. ¶¶ 17-18; Unintended Powered Roll-Away in Reverse After Parking – Jeep Grand Cherokee (the "Final Report") (ECF Nos. 4-1 and 9-1) at i.) After remaining stationary for "'a relatively short time, [the vehicle] begins to travel in Reverse, usually stopping only when it hits something.'" (Compl. ¶ 18; Final Report at i.) The Report found that 1999 Jeep Grand Cherokees could experience UPRs. (Compl. ¶ 19; Final Report at 20-21.)

Sometime after NHTSA issued the Report, DaimlerChrysler wrote a letter to owners of 1999-2004 Jeep Grand Cherokees (the "Letter"), titled "Recommendations for Avoiding Unintended Movement of Your 1999-2004 Model Year Jeep Grand Cherokee." (Compl. ¶ 20; Recommendations for Avoiding Unintended Movement of Your 1999-2004 Model Year Jeep Grand Cherokee ("DaimlerChrysler Letter") (ECF Nos. 4-2 and 9-2).) The Letter notified owners that "[u]nintended movement of a vehicle could occur if the automatic transmission shift lever is not engaged in the 'Park' position . . . [which] could injure those in and/or near the vehicle." (DaimlerChrysler Letter.) It also advised drivers to always shift into Park, remove the key and apply the parking brake before exiting the vehicle. (DaimlerChrysler Letter.) The Letter included three "recommended steps" to ensure safe and full engagement in the Park position: (1) pushing the shift lever button and firmly moving the lever completely forward; (2) checking the center console indicator to see the shift lever in its "P" position; and (3) confirming that the shift lever would not move backward without depressing the shift lever button. (DaimlerChrysler Letter.)

Plaintiffs allege that, through the Letter sent to 1999-2004 Jeep Grand Cherokee owners and/or the Report issued by NHTSA, Defendants knew of the Jeep's roll-away risk. (Compl. ¶¶ 15, 17-21.) Alternatively, Plaintiffs allege constructive knowledge — that Defendants "would have been aware if they had performed a careful and th[orough] examination of the Jeep." (Compl. ¶ 21.) Nonetheless, neither Olverson nor the Marina warned Plaintiffs about the Jeep's UPR potential or the steps that Plaintiffs could have taken to avoid that risk. (Compl. ¶ 22.) As a direct and proximate result of Defendants' failure to, among other things, warn Plaintiffs of the Jeep's dangerous condition, Plaintiffs have suffered "severe permanent physical and emotional injuries," loss of income and earning capacity, and they have incurred medical bills and anticipate more. (Compl. ¶¶ 30, 32-33, 40, 42.)

Defendants attack the sufficiency of the Complaint on three fronts. First, Defendants argue that the Complaint alleges a factual impossibility when read in conjunction with the Report. (Def. Olverson's Brief in Supp. of his Rule 12(b)(6) Mot. to Dismiss ("Olverson's Brief") (ECF No. 5) at 5; Def. Marina's Mot. to Dismiss ("Marina's Mot.") (ECF No. 9) at 2-3.) The Report states that UPRs could only occur "when mis-shifted" or, in other words, "when the transmission was not properly shifted into gated Park." (Olverson's Brief at 5 (quoting the Final Report at 10, 20).) Plaintiffs allege that Meury placed the Jeep in Park. (Compl. ¶ 29.) According to Defendants, this negates any possibility of a UPR, because UPRs only occurred when *not* in Park. (Olverson's Brief at 5; Marina's Mot. at 2-3.) Second, Defendants assert that Plaintiffs fail to allege sufficient facts that Defendants had actual knowledge of the Jeep's propensity to experience UPRs. (Olverson's Brief at 5-7; Marina's Mot. at 3.) Third, Defendants claim that Plaintiffs fail to allege sufficient facts that Defendants had constructive

4

knowledge of the Jeep's dangerous condition, because Defendants could not have constructive knowledge of a factual impossibility. (Olverson's Brief at 7-8; Marina's Mot. at 3.) Plaintiffs respond that the factual allegations of their Complaint stand consistent with the Report's conclusions, and that they have adequately pleaded facts to support Defendants' actual or constructive knowledge of the Jeep's UPR propensity to survive Defendants' motions. (Pls.' Opp. To Defs.' Rule 12(b)(6) Mot. to Dismiss ("Pls.' Opp.") (ECF No. 13) at 3-7.)

## II.   STANDARD OF REVIEW

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992) (citation omitted). The Federal Rules of Civil Procedure "require[] only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint need not assert "detailed factual allegations," but must contain "more than labels and conclusions" or "formulaic recitation of the elements of a cause of action." *Id.* (citations omitted). Thus, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," to one that is "plausible on its face," rather than merely "conceivable." *Id.* at 555, 570. In considering such a motion, a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff, drawing all reasonable inferences in the plaintiff's favor. *Kensington Volunteer Fire Dept., Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (additional citation omitted); *T.G. Slater & Son, Inc. v.*

*Donald P. & Patricia A. Brennan LLC*, 385 F.3d 836, 841 (4th Cir. 2004) (additional citation omitted). Legal conclusions enjoy no such deference. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although typically constrained to the allegations within the complaint itself at this stage, the Court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in [the] complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (additional citations omitted).

### III.   DISCUSSION

Plaintiffs bring one count of negligence against Defendants, seeking recovery for their alleged injuries that resulted from the UPR on the Marina's boat ramp. To plead negligence under Virginia law, a plaintiff must allege (1) the existence of a legal duty, (2) a breach of that duty and (3) proximate causation that the breach resulted in (4) damages to the plaintiff. *McGuire v. Hodges*, 273 Va. 199, 205-05 (2007). In the context of premises liability, a business owner "has a duty to exercise ordinary care to insure that the premises are reasonably safe for all invitees." *Arthur v. Crown Cent. Petroleum Corp.*, 866 F. Supp. 951, 953 (E.D. Va. 1994) (citing *Knight v. Moore*, 179 Va. 139, 145 (1942)). This requires the owner to warn business invitees of an unsafe condition on the premises about which the owner knows or should know. *Memco Stores, Inc. v. Yeatman*, 232 Va. 50, 54 (1986) (citing *Colonial Stores v. Pulley*, 203 Va. 535, 537 (1962)). Thus, invitees have the right to assume that the area is reasonably safe, and they have no duty to protect themselves from dangerous conditions of which they lack knowledge or warning. *Arthur*, 866 F. Supp. at 953 (additional citations omitted).

As an initial matter, the Court agrees with Defendants' argument that it may consider

6

both the Report and the Letter, as attached to each motion to dismiss, in addition to the factual allegations lodged in the Complaint. (Olverson's Brief at 4; Marina's Mot. ¶ 7.)  The Complaint quotes from and references both documents. (Compl. ¶¶ 17-20, 23.)  Indeed, Plaintiffs rely on the Report and the Letter not only to show that Defendants knew or should have known about the Jeep's defect, but also to define the dangerous condition itself, the propensity for UPRs, and to connect it to the Jeep at issue.  Thus, the Court finds both documents integral to the Complaint and, as no party disputes their authenticity, both are properly under the Court's consideration for purposes of resolving the motions to dismiss. *Goines*, 822 F.3d at 166.

Plaintiffs allege a series of duties that Defendants owed to them as business invitees of the Marina. (Compl. ¶¶ 35-39.)  Specifically, Plaintiffs claim that Defendants had a duty to provide a safe tow vehicle, to service and maintain that vehicle, to know of its dangerous propensities, to warn their patrons that the Jeep could experience a UPR, and to instruct them on how to prevent the possibility of such an incident. (Compl. ¶¶ 35-39.)  Plaintiffs then allege that Defendants breached these duties by providing the defective Jeep for Plaintiffs' use and by failing to provide a reasonably safe premises, to properly maintain and service the Jeep and correct its propensity for UPRs, to discover and warn Plaintiffs of the Jeep's dangerous condition of which Defendants knew or should have known, and to remove it from use by Marina patrons. (Compl. ¶ 40.)  Plaintiffs contend that these acts and omissions by Defendants caused Plaintiffs' injuries.  At this stage of the litigation, the Court finds that Plaintiffs have alleged sufficient facts to support a plausible claim for relief and survive the motions to dismiss.  The Court addresses Defendants' arguments in turn.

## A. Plaintiffs do not allege a factual impossibility.

According to the Complaint, Meury placed the Jeep "in Park, exited, and then moved to the rear" to secure the dinghy onto the trailer. (Compl. ¶ 29.) Defendants argue that this allegation makes it factually impossible that the Jeep experienced a UPR, because the Report concluded that UPRs only occurred "when the transmission was not properly shifted into gated Park."[1] (Olverson's Brief at 5 (quoting the Final Report at 20).) Indeed, Defendants submit that the Report analyzed the testing of two 1999 Jeep Grand Cherokees and found that "[w]hen the shift lever was in gated Park, the pawl was fully engaged and the vehicle would not move." (Olverson's Brief at 5 (quoting the Final Report at 9).) But Defendants read the Report too narrowly in connection with the Complaint.

Defendants correctly note that the 1999 Jeep Grand Cherokees did not exhibit UPRs when shifted into "gated Park." (Final Report at 8-9, 20.) However, the Report reveals more. The testing discussed in the Report stemmed from complaints of more than 400 Jeep Grand Cherokee owners that "when they stop the vehicle, place the transmission shift lever in Park, and exit . . .with the engine running, the vehicle at first remains stationary, then begins to travel in Reverse." (Final Report at 1.) That the Report used the terms "Park" and "gated Park" distinctly, supports Plaintiffs' choice to use the former. The Complaint does not specify that Meury shifted the Jeep fully into "gated Park." Instead, like the affected owners mentioned in the Report, Plaintiffs allege that he placed the Jeep in Park. (Compl. ¶ 29.) The Grand Cherokee drivers in the Report clearly believed that they had placed their vehicles in Park before getting out with the engine still running. Indeed, the defect is predicated on the driver's mistaken belief

---

[1]     The Report defined "[g]ated Park" as "[t]he location at which the shift lever is locked in Park." (Final Report at 1.)

8

that they had shifted the vehicle into Park.  In reality, there was a "flat spot" between Reverse

and Park that could lead the driver to "believe the transmission was in Park because of the lack

of vehicle movement."  (Final Report at 20.)  By alleging that Meury shifted the Jeep into Park

(not gated Park), the Complaint mirrors the allegations made by the 400-plus Grand Cherokee

owners summarized in the Report.  (Final Report at i, 2.)  A reasonable inference that Meury

believed that he had fully shifted into gated Park when he stopped and exited the Jeep, but in fact

he had shifted to some point between Reverse and Park, follows from the Complaint's factual

allegations as well as the reasons for and conclusions of the NHTSA Report.

### B.  Plaintiffs plead sufficient facts to support a plausible claim that Defendants had actual and/or constructive knowledge of the Jeep's propensity for UPRs.

Defendants next attack the Complaint for failing to allege sufficient facts of Defendants'

actual or constructive knowledge of the chance that the Jeep could experience a UPR.

(Olverson's Brief at 5-8; Marina's Mot. at 3.)  This argument must fail at this stage of the

litigation.

To establish a *prima facie* case for negligence, a plaintiff must show that the defendant

business owner had actual or constructive knowledge that the dangerous condition existed.

*Arthur*, 866 F. Supp. at 953.  "If an ordinarily prudent person, given the facts and circumstances

[that the defendants] knew or should have known, could have foreseen the risk of danger

resulting from such circumstances, [the defendants] had a duty to exercise reasonable care to

avoid the genesis of the danger."  *Memco Stores*, 232 Va. at 54.  Further, to establish

constructive knowledge, a plaintiff can show that the defect was noticeable, and that it had

existed for a sufficient length of time to charge the owner with notice of the condition.  *Grim v.*

*Rahe, Inc.*, 246 Va. 239, 242 (1993).  To ensure sufficiency of the length of time, courts often

impose a burden on the plaintiff of showing when the dangerous condition occurred. *Id.* However, they do this to guard against imposing liability on an owner for a defect that may have occurred only minutes before the accident, thus precluding any chance for the owner to detect it. *Id.* at 242-43. Showing exactly when the defect occurred, though not required, can support the sufficiency of time prong of constructive knowledge. In this case, Plaintiffs must sufficiently allege that Defendants had actual or constructive knowledge of the Jeep's potential to experience a UPR and, therefore, had a duty to warn its patrons of that dangerous propensity.

To allege that Defendants actually knew of the Jeep's propensity for UPRs, Plaintiffs point to the Report and the Letter that followed. (Compl. ¶¶ 17-21, 23.) The Jeep was registered to Olverson, at the Marina address, since January 2003. (Compl. ¶ 15.) In February 2003, NHTSA issued the Report on the potential for UPRs in certain Jeep Grand Cherokees, including the 1999 model. (Compl. ¶¶ 17-19.) Thereafter, DaimlerChrysler's Letter notified 1999-2004 Jeep Grand Cherokee owners of the potential for "[u]nintended movement" of vehicles not properly engaged in Park, and recommended certain preventative steps to reduce the likelihood of such movement. (Compl. ¶ 20.) As alleged, Defendants neither warned Plaintiffs about the UPRs nor informed Plaintiffs about how to prevent them, and Defendants kept the Jeep in service for patrons of the Marina. (Compl. ¶¶ 22-23.)

Viewed in the light most favorable to Plaintiffs, the Complaint allows for the reasonable inference that DaimlerChrysler sent the Letter to Olverson, as an owner of a 1999 Jeep Grand Cherokee, at the Marina, the Jeep's registered address. Defendants accurately note that Plaintiffs do not allege who received the Letter, but that does not sink Plaintiffs' claim. As stated, the Court infers that the Letter went to Olverson — as the owner of the Jeep — at the Marina's

address where he registered it. Even if Olverson himself did not receive the Letter, the Complaint also contemplates the possibility that one or more of Defendants' "agents, servants, and employees" did in the course of their employment. (Compl. ¶ 41.)

The Report similarly supports Plaintiffs' claim. (Compl. ¶¶ 17-20.) It offers a more detailed explanation of the background, testing, and conclusions surrounding the Jeep Grand Cherokee's UPR potential. It adds context to the Letter. Even if DaimlerChrysler did not attach the Report, the Letter referred its recipients to their vehicle's manual and a customer assistance phone number to learn more about the Grand Cherokee's unintended movement potential. (DaimlerChrysler Letter.) The inference that Defendants had actual knowledge of the Jeep's dangerous condition through the Letter or the Report might not survive heightened scrutiny at summary judgment or trial, but the allegations suffice at this stage of the litigation. The Complaint plausibly alleges that Defendants knew of the Jeep's UPR risk, and thus had a duty to warn their customers accordingly.

Finally, Defendants' argument that the Complaint insufficiently pleads constructive knowledge rests on the prior argument of factual impossibility that the Jeep experienced a UPR while in Park. Because the Court found no factual impossibility between the Complaint and the Report, this argument also necessarily fails.

Moreover, Plaintiffs have properly alleged constructive knowledge. The Complaint alleges facts that support that the Jeep's defect was noticeable and had existed for a sufficient length of time to give rise to Defendants' constructive knowledge of it. *Grim*, 246 Va. at 242. Defendants provided the Jeep for their guests to use at the marina, on a boat ramp, to pull boats to and from the water. (Compl. ¶¶ 11-13.) That necessarily involves backing the Jeep down the

11

ramp and stopping to either release a boat from or secure it to the connected trailer. Defendants owed a duty to their patrons, including Plaintiffs, to maintain the Jeep in a safe condition for their use, and for that purpose, on the premises. (Compl. ¶¶ 15-16, 21, 24-26, 35-37.) Although that duty may not encompass discovery of hidden defects, it does capture the defect alleged here — the UPR — which had the potential to occur when a patron used the Jeep for the very purpose that it was provided by Defendants.

The Complaint alleges that the defect existed since the Jeep's manufacture in 1999. (Compl. ¶¶ 12, 19.) The NHTSA acknowledged the 1999 Jeep Grand Cherokees' propensity for UPRs in February 2003, and DaimlerChrysler notified affected Grand Cherokee owners of the vehicle's unintended movement thereafter. (Compl. ¶¶ 17-20.) Therefore, Defendants should have known about the possible UPRs.

Additionally, Olverson owned the Jeep since January 2003, and Plaintiffs' accident on the boat ramp occurred over eleven years later. (Compl. ¶¶ 15, 26-33.) There is no question that more than a decade of owning and maintaining the Jeep constitutes "a sufficient length of time" to charge Defendants with constructive knowledge of its defect. *See Grim*, 246 Va. at 242-43 (noting that five minutes would not confer constructive notice of a broken light fixture, without deciding whether one day would confer such notice). Consequently, Plaintiffs allege sufficient facts to support that Defendants knew or should have known of the Jeep's roll-away potential.

## IV.    CONCLUSION

Because Plaintiffs allege sufficient facts to state a plausible claim of negligence, the Court recommends that Defendants' Rule 12(b)(6) Motions to Dismiss (ECF Nos. 4 and 9) be

DENIED.  The Clerk is directed to file this Report and Recommendation electronically and send a copy to all counsel of record and to United States District Judge M. Hannah Lauck.

### NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

_____/s/_____
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date:  January 13, 2017

13